IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANGELEAH M. & AVA M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANGELEAH M. AND AVA M., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

D'ANGELO E., APPELLANT.

Filed October 11, 2016.    No. A-16-189.

Appeal from the Separate Juvenile Court of Lancaster County: ROGER J. HEIDEMAN, Judge. Affirmed.

Matt Catlett, of Law Office of Matt Catlett, for appellant.

Joe Kelley, Lancaster County Attorney, Shellie D. Sabata, and Michael Florance, Senior Certified Law Student, for appellee.

INBODY, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

D'Angelo E. appeals from the decision of the separate juvenile court of Lancaster County terminating his parental rights to his daughters, Angeleah M. and Ava M. We affirm.

BACKGROUND

At the outset we note that this is the fourth time this case comes before us. We briefly recount the history of the case.

D'Angelo is the father of Angeleah, born in 2008, and Ava, born in 2009. Claire M. is the biological mother of Angeleah and Ava. D'Angelo and Claire were never married, but they lived

- 1 -

together until D'Angelo went to prison in February 2009; Angeleah was 9 months old at that time and Claire was still pregnant with Ava. The girls were removed from Claire's custody in February 2011, and placed in the custody of the Nebraska Department of Health and Human Services (DHHS). Angeleah and Ava were adjudicated in March 2011 due to the faults or habits of Claire. The girls, who were still in DHHS custody, were returned to the care of their mother in November 2012, but were again removed to out-of-home placement in April 2013, where they have remained. Claire eventually relinquished her parental rights to Angeleah and Ava in August 2013, and the State subsequently withdrew its pending motion to terminate Claire's parental rights to the girls. Because Claire is not part of this appeal, she will only be discussed as necessary.

At the time of the girls' removal from Claire in February 2011, D'Angelo was incarcerated (convicted for conspiracy to distribute crack cocaine); he was released from prison in June 2012. After a hearing in November 2012, D'Angelo was allowed to have weekly supervised visits with the girls. Visits continued until April 2013 when D'Angelo violated his parole and was again incarcerated. D'Angelo remained incarcerated until January 2014, at which point he was put on supervised release; he did not have visitation with the girls during his incarceration.

*Previous Appeals.*

In May 2013, while D'Angelo was incarcerated, the State filed a second supplemental petition and motion for termination of D'Angelo's parental rights; this petition made allegations only related to Ava, and the petition was subsequently amended to include both children. In November, Angeleah and Ava were adjudicated under Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2013), due to the faults or habits of D'Angelo, and his parental rights to the girls were terminated. D'Angelo appealed the termination of his parental rights. In a memorandum opinion, *In re Interest of Angeleah M. & Ava M.*, No. A-13-1060, 2014 WL 3489846 (Neb. App. July 15, 2014) (selected for posting to court Web site) (juvenile court's judgment on mandate filed September 2, 2014), this court reversed the termination of D'Angelo's parental rights, but affirmed the adjudication; we remanded the matter back to the juvenile court for further proceedings.

In September 2014, the juvenile court issued a disposition order stating that the primary permanency plan was reunification with an alternative plan for adoption. Angeleah and Ava were to remain in the temporary legal custody of DHHS and were to remain in their foster home placement. In addition to ordering D'Angelo to cooperate with therapeutic visitation, the juvenile court ordered D'Angelo to sign releases of information as requested by DHHS, not use or possess drugs or alcohol, cooperate in a parenting assessment and a pretreatment assessment, cooperate with random drug and alcohol testing, cooperate with all service providers, inform DHHS of any change in address or telephone number, and maintain appropriate housing and a legal means of support for himself and his children. DHHS was ordered to make any treatment or services recommended by D'Angelo's assessments and evaluations available to him. D'Angelo appealed the dispositional order. Review hearings were held in October 2014 and April 2015, but because the appeal was pending, the prior disposition of September 2014 was ordered continued. In case No. A-14-860, an unpublished memorandum opinion filed on April 27, 2015, this court affirmed the dispositional order of the juvenile court (petition for further review denied June 17, 2015; juvenile court's judgment on mandate filed July 14, 2015).

In February 2015, while the dispositional order was on appeal to this court, DHHS filed a motion in the juvenile court to suspend D'Angelo's visitation with Angeleah and Ava. After a hearing on the matter, the juvenile court entered an order temporarily suspending D'Angelo's visits. D'Angelo appealed the temporary suspension order. In *In re Interest of Angeleah M. & Ava M.*, 23 Neb. App. 324, 871 N.W.2d 49 (2015), *review denied* (Dec. 23, 2015) (juvenile court's judgment on mandate filed January 12, 2016), this court dismissed the appeal for lack of jurisdiction.

*Current Appeal.*

On October 8, 2015 (after our opinion was released in *Angeleah M. & Ava M.*, 23 Neb. App. 324, 871 N.W.2d 49, but before the mandate was spread and judgment on mandate entered), the State filed a motion for termination of D'Angelo's parental rights to Angeleah and Ava pursuant to Neb. Rev. Stat. § 43-292(1), (2), (6), and (7) (Cum. Supp. 2014). The State alleged that: D'Angelo abandoned Angeleah and Ava for 6 months or more immediately prior to the filing of the motion for termination of parental rights; D'Angelo substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the adjudication; Angeleah and Ava had been in out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

A review hearing was held in November 2015, but the court ordered the matter continued because of the pending appeal on visitation; prior orders of the court were to remain in effect.

The hearing on the motion for termination of D'Angelo's parental rights to Angeleah and Ava was held January 26 through 29, 2016. A summary of the evidence follows.

Heather Post, a children and family services specialist with DHHS, has been the case manager for Angeleah and Ava since November 2013. Post testified that after this court reversed the original termination of D'Angelo's parental rights, she made numerous attempts to contact him to begin the process of reunification. She documented her efforts on N-FOCUS, the DHHS data base, and that documentation was received into evidence as exhibits 70 and 71. Beginning in July 2014, Post sent a certified letter to D'Angelo (returned as undeliverable), left him voice messages (no response), and repeatedly emailed his attorney. Post testified that one time when she called D'Angelo, as soon as she said her name he told her to talk to his attorney and hung up.

Post stated that at the disposition hearing in September 2014, D'Angelo was ordered to cooperate with parenting assessments and pretreatment assessments, but he said he was not willing to participate and planned to appeal the order. After D'Angelo's appeal was concluded, Post made sure everything was in place for the assessments to occur with Dr. Chris Rathburn. D'Angelo did not complete the assessments; he showed up late for the first appointment so it was rescheduled, and then he did not show up for the second and third appointments at which time D'Angelo was no longer allowed at Dr. Rathburn's office. Post then set up an evaluation for D'Angelo with Dr. John Herdman, which was completed in August 2015.

After D'Angelo completed his assessments with Dr. Herdman, Post began contacting D'Angelo and his attorney about services to be set up per Dr. Herdman's recommendations (i.e. therapy and a psychiatric evaluation). Post was able to meet with D'Angelo and his attorney on

October 2, 2015, in the attorney's office. Post had wanted the meeting to be a team meeting with all parties, but after several emails with D'Angelo's counsel, it became clear that if Post wanted to meet with D'Angelo, the only three people that could be present were D'Angelo, his attorney, and Post. She agreed to attend the meeting alone because it was the only way she could meet with D'Angelo face-to-face; the only previous face-to-face meeting that Post had with D'Angelo was one year prior, in October 2014, and all other attempts to meet with him or have him present at team meetings had been unsuccessful. (Post testified that in October 2014, D'Angelo's attorney called because he and D'Angelo wanted her to come to an impromptu meeting to discuss D'Angelo's concerns that the girls were being brainwashed. The October meeting was the only meeting she had with D'Angelo during the entire year of 2014). At the October 2015 meeting, D'Angelo said that he was willing to do the therapy that Dr. Herdman recommended.

Post tried to set up therapy for D'Angelo with Dr. Rathburn, but his office stated that D'Angelo could not return. Post then made arrangements for D'Angelo to see Dr. Herdman, but D'Angelo terminated therapy with him after only two appointments. Post received an email from D'Angelo's counsel revoking all communication between her and Dr. Herdman (this was the day after she sent D'Angelo and his attorney a copy of the November 17, 2015, letter she received from Dr. Herdman with his recommendations; the contents of the letter are set forth later in this opinion). Post then set up services with Anthony Kelley per D'Angelo's request. D'Angelo began therapy with Kelley within the month immediately prior to the termination hearing.

Post also made arrangements for D'Angelo to have a medication evaluation as recommended by Dr. Herdman. Post set up an October 27, 2015, appointment for D'Angelo with Lindsey Manzel (now known as Lindsey Teten) at Cheney Psychiatric; Manzel recommended that D'Angelo take medication. At a review hearing held in November, D'Angelo stated he was not willing to take medication. In December, Post received an email from D'Angelo's attorney stating that D'Angelo was willing to try medication in combination with individual therapy. Post set up another medication assessment at D'Angelo's request; he met with Collette Wheeler at Best Psychiatric on January 14, 2016 (less than two weeks before the termination hearing). Post had spoken to Wheeler but had not yet received her report. Wheeler told Post that she could not diagnose D'Angelo at that time (he minimized a lot of the conversation and did not report any anger issues), but Wheeler was recommending anxiety and mood medications for the trauma and anxiety he reported to her; D'Angelo told Wheeler that he was not willing to take medications at that time.

Post testified regarding D'Angelo's overall efforts throughout this case. After the September 2014 disposition order, D'Angelo was not willing to participate in any services, other than therapeutic visits, until his appeal was resolved. After the disposition order was affirmed on appeal (April 2015), and judgment on the mandate entered (July 2015), D'Angelo did complete his parenting and pretreatment assessments. He also completed parenting classes and anger management classes. D'Angelo participated in psychiatric evaluations, but was not willing to take medications as recommended. While D'Angelo had begun individual therapy, he had not yet successfully completed therapy. D'Angelo refused to provide his address and phone number to DHHS (despite being court ordered to do so pursuant to the September 2014 disposition order), had not obtained appropriate housing (he had had at least three different addresses, was not

forthcoming with information, and would not allow a walkthrough of his residence), and would not meet with Post (other than the two times in October 2014 and October 2015). Since his visits were suspended in February 2015, D'Angelo had not contacted Post to ask about the girls or their well-being. Post testified that there had been a lack of progress in this case and it was not in the girls' best interest to be suspended in foster care to see if D'Angelo ever completes the rehabilitation plan.

Dr. Lisa Logsden, a psychologist, is the direct treatment provider for Angeleah and has provided therapeutic interactions for Ava; she also supervised clinical work provided for Ava. The girls were first referred to Dr. Logsden in June 2014. Ava began therapy in June and underwent a psychological evaluation in July. Angeleah began therapy in July and underwent a psychological evaluation in August. Both girls were diagnosed with post-traumatic stress disorder (PTSD), and Ava was also diagnosed with reactive attachment disorder.

Dr. Logsden oversaw weekly therapeutic visits between D'Angelo and the girls from September 2014 to February 2015. Because D'Angelo had previously been incarcerated, there had been infrequent interaction between him and the girls; the purpose of the therapeutic visits was to develop an attachment relationship between them. As part of her standard practice, Dr. Logsden asked for an individual session with D'Angelo before the therapeutic visitation. Dr. Logsden wished to better understand D'Angelo's goals and desires in his relationship with the girls, and address any of his questions or concerns. For several weeks, however, D'Angelo was not willing to have an individual session, but with the encouragement of DHHS he finally agreed to an abbreviated 20- to 30-minute session immediately before the first therapeutic visit.

Dr. Logsden testified that when the therapeutic visits began, Ava was "disregulated" and Angeleah was much more reserved. From September to December 2014 there was positive progress. However, in January and February 2015 there was some interruption in visitation by D'Angelo (and once because Angeleah was ill); when the interruption occurred, the girls had anxiety demonstrated by apprehension and emotional reactivity accompanied by some aggression. Visits were suspended in February because of a concern that D'Angelo attended a visit under the influence of marijuana (Dr. Logsden noticed a slight odor of marijuana) and there was a recommendation that he complete a substance use evaluation and/or psychological evaluation before continuing visits. When the visits stopped, the girls exhibited a sense of sadness and "disregulation" for 4 to 6 weeks, then they made increased progress in their therapeutic goals and their behaviors stabilized.

Dr. Logsden testified that the girls needed consistency, predictability, and support within their environment in order to develop healthy attachments; frequent moving and exposure to domestic violence both lead to insecurity. Any ongoing contact between D'Angelo and Claire would cause concern for the girls' security and safety because of the reasons that led to the children's removal from Claire's care and to the relinquishing of her parental rights. Dr. Logsden was never in a position to recommend that the children be placed with D'Angelo because the treatment recommendations provided and engaged in had not been completed. Dr. Logsden testified that the girls needed permanent placement and it was not in their best interests to continue in foster care.

Dr. Herdman, a licensed psychologist and a licensed drug and alcohol counselor, testified that he conducted a parenting assessment of D'Angelo in July and August 2015. This assessment included an initial diagnostic interview, a mental status examination, a psychological evaluation, and observation of the parent and children. Based on his evaluation, Dr. Herdman diagnosed D'Angelo with bipolar disorder (manic, severe), adjustment disorder with anxiety, antisocial personality disorder, and narcissistic personality disorder with paranoid and borderline personality features. His reported diagnostic impression also states "r/o Schizophrenia, Paranoid type" and "r/o Delusional disorder." Dr. Herdman did not see active schizophrenia or delusional disorder, but he saw characteristics of those disorders, which he conceptualized as bipolar disorder (manic, severe). Personality disorders are pervasive and life-long. People with D'Angelo's diagnoses can successfully parent, but psychotherapy to address the personality disorders is necessary. Additionally, the bipolar issue requires special attention and D'Angelo's mood instability is such that without appropriate psychiatric evaluation and possible medication, it is "very improbable that he could provide parenting safety for children." Dr. Herdman noted that D'Angelo had not seen his children for about six months and the attachment between D'Angelo and his children was "almost non-existent." If there is a positive bond between a parent and a child, the child will be excited to see the parent, even when separated for an extended period of time. Dr. Herdman did not observe such a positive bond in this case.

In addition to conducting the above assessment of D'Angelo in July and August 2015, Dr. Herdman began individual therapy with D'Angelo in November. D'Angelo only participated in two sessions before terminating further appointments. According to Dr. Herdman, D'Angelo was upset with recommendations he made to D'Angelo's caseworker. The recommendations, found in a November 17 letter from Dr. Herdman to Post (received into evidence as exhibit 64) stated:

> [D'Angelo's] not wanting to take medication [as recommended by a psychiatric evaluation] is his choice; however, his not taking medication will have a negative impact on his mental health and will be a detriment to his being able to parent his two daughters. I would make it a condition of his being able to see his daughters that his mental health becomes stable. At this point in time it is not.

(Post sent a copy of this letter to D'Angelo and his counsel, at which point D'Angelo's counsel revoked all communication between Post and Dr. Herdman.) Dr. Herdman testified that psychotherapy alone is insufficient for D'Angelo to be able to parent.

Manzel is a psychiatric nurse practitioner with Cheney Psychiatric. Manzel conducted a psychiatric evaluation of D'Angelo on October 27, 2015; her evaluation report was received into evidence as exhibit 69. The report states:

> [D'Angelo] reports delusional ideas about being controlled by external forces. States that he feels people and "probation and DHHS are controlling every move I make and that they are conspiring against me." He expresses persecutory delusions. Reports bizarre thoughts that are not grounded in reality. [D'Angelo] discusses suspiciousness and feelings of persecution. Thinking was derailed throughout the interview and inconsistent at times. [D'Angelo] discussed feelings of superiority, boastfulness and expressed hostility towards those involved in both his case and his care.

The report notes that D'Angelo's judgment and his insight into problems appeared poor. Manzel diagnosed him with bipolar disorder (current episode manic severe with psychotic features) and narcissistic personality disorder; as she had not been provided with any previous evaluations of D'Angelo, Manzel's diagnosis was based only on her interview with D'Angelo. According to Manzel, when bipolar disorder falls in the moderate to severe range, it is very unlikely that psychotherapy alone will resolve the symptoms. D'Angelo's recommended treatment plan was medication management. Manzel discussed her recommendations with D'Angelo and told him that he would benefit from medication. Manzel did not discuss specific medications with D'Angelo because he "did not buy into it" and it was clear that he was not willing to start taking medication at that point. She recommended that D'Angelo work with a psychologist so that he could gain insight into his mental illness.

The girls have been in their current foster placement since September 2013; the foster parents adopted the girls' younger brother after Claire relinquished her parental rights (D'Angelo is not the father of that child). Their foster mother testified that when Angeleah and Ava came to live with her, Angeleah was suppressing her fears and Ava displayed outbursts of anger and aggression. Both girls started therapy and their behaviors subsided. When therapeutic visits with D'Angelo started in September 2014, Angeleah went back to her introvert personality and began sucking her thumb, Ava's aggression came back and she began wetting the bed, and both girls lost focus on their school work. The regressive behaviors continued throughout the therapeutic visits. However, approximately two weeks after visits were suspended in February 2015, the girls' behaviors normalized; Angeleah stopped sucking her thumb, Ava quit wetting the bed and her aggression lessened significantly, both stopped having night terrors, and both displayed more focus on their schooling. The girls saw D'Angelo once more in August 2015 for the parenting assessment with Dr. Herdman; in the car afterwards, Angeleah screamed, cried, and had difficulty talking, and Ava was very emotional and visibly upset. At the time of the termination hearing, both girls were doing well in school and at home.

Post testified that she was concerned about D'Angelo's continued contact with Claire because of their unstable relationship history, domestic violence issues, and because Claire is still a risk to the children (she relinquished her parental rights after making little progress in her own case). She also noted that since the dispositional phase, D'Angelo has always claimed he has not had contact with Claire. Testimony from other witnesses showed that D'Angelo and Claire have had contact throughout this case. The foster mother testified that she saw D'Angelo and Claire together at the intersection of 48th and Highway 2 in Lincoln, Nebraska, in December 2014.

A police officer with the Lincoln Police Department testified that in December 2014, he responded to a vandalism report at a hotel in Lincoln. When the officer arrived at the hotel, D'Angelo said that he and his "girlfriend" Claire argued and she threw an object through the hotel room window and left. D'Angelo told the officer he had spoken with the owner and agreed to pay for damages; the officer confirmed the agreement and no citation was issued. During his testimony, D'Angelo denied that Claire damaged the hotel room and said he never paid for any damages.

Brooklyn M., Claire's sister, testified that D'Angelo and Claire have been in a romantic relationship for 7 to 8 years and that he is "with" Claire. In the summer of 2015, Claire and

D'Angelo both resided at a house on Garfield Street in Lincoln; Brooklyn was at the house on a weekly basis and observed arguments and "just a lot of verbal abuse, I guess." Later in 2015, Claire moved to a house on Garrett Lane, and still lived there at the time of the termination hearing. D'Angelo's things were in the Garrett Lane house and he was there every time Brooklyn visited. Brooklyn was at the house every week or two and during each visit observed arguments between Claire and D'Angelo. During these arguments, D'Angelo told Claire she was "'a worthless mom'" and "'everything's her fault.'" In the past year, Brooklyn observed D'Angelo in the presence of marijuana every time she was at the Garfield and Garrett Lane houses; D'Angelo was "smoking it and selling it." Brooklyn acknowledged that she had smoked marijuana with D'Angelo in the past. Brooklyn last saw D'Angelo and Claire together on January 11, 2016.

Brooklyn testified that D'Angelo drives Claire's vehicle, a 2-door "little red car." The foster mother testified that in October 2015, she had seen D'Angelo and Claire get out of a small red sedan and enter an apartment complex on Garrett Lane, which is near the girls' daycare; she had previously seen D'Angelo by the apartment complex in September. Post testified that she saw D'Angelo driving a red sedan in November 2015 in the courthouse parking lot.

Brooklyn testified that D'Angelo said he was getting the girls back soon, that the plan was to have Claire take care of them, and that he was trying to get the girls back so that Claire could have them. Brooklyn said that she agreed to testify because "no matter how much I want the girls, you know, to still be a part of our family and still be able to see them, I just don't feel like they deserve to live in a chaotic lifestyle like their parents live."

D'Angelo testified that he has not lived with Claire since going to prison in 2009. He said he has lived at four different addresses since January 2014, and that he lived with his grandmother at two of those addresses since February or March 2015 (there is some question as to whether he had reported more addresses to his probation officer). He does not stay with his grandmother every night, just when he "feel[s] like it." He acknowledged that his grandmother has been convicted of felony assault, and that she has a history of drug and substance abuse. He would not live with the girls at his grandmother's home, and plans to get his own place but had not done so yet because he did not have custody of the girls and he is saving money by staying with others.

D'Angelo said he was not in a romantic relationship with Claire at the time of the termination hearing, and that while he does not live with her, he has had contact with her and has been to her residence; he most recently saw her around Thanksgiving 2015. D'Angelo claimed he did not see Brooklyn when he has visited Claire. D'Angelo also denied driving Claire's vehicle, and said that testimony from Post, Brooklyn, and the foster mother to the contrary "sounds like a conspiracy" and that they are liars. He also denied Brooklyn's allegation that D'Angelo was trying to get the girls back for Claire. D'Angelo testified that no court order said he could not visit Claire. He does not believe that it is unsafe for the girls to be around Claire, but said he would comply if the court ordered him to keep Claire away from the girls.

D'Angelo testified that he began having weekly therapeutic visits with Angeleah and Ava in September 2014. When visits first started, the girls were "standoffish" and shy, and it took them a little while to warm up to him; he understood their behaviors. During visits, he and the girls talked, played games, read, and colored.

D'Angelo stated that in July 2015, after this court affirmed the disposition order, he started complying with the juvenile court's orders. He met with Dr. Herdman for assessments in July and August. He later met with him for two individual sessions, but they did not "click." D'Angelo felt that Dr. Herdman believed his (D'Angelo's) desire to have a music career was grandiose and delusional; D'Angelo was depressed by this since he had been working towards being a professional musician for years. D'Angelo also was not comfortable with the fact that Dr. Herdman's intern sat in on sessions (there is some evidence in the record that the intern, a master's degree student, previously worked at DHHS, but never on this case; Dr. Herdman testified that D'Angelo consented to the intern's presence at sessions).

D'Angelo testified that he was "very standoffish" when he met with Manzel because he did not want to be there and his "attitude wasn't even . . . accepting to it" and he "got out of there as quick as possible." He did not remember whether they discussed the possibility of him being prescribed medication. D'Angelo met with Wheeler two weeks before the termination hearing; they were supposed to have a follow-up the day of his testimony, but D'Angelo said he would miss the appointment (presumably because he was in court). D'Angelo was not thrilled with the idea of medication, but said he was willing to try it and "see how it goes"; he later said he was willing to take medication if prescribed, "[b]ut I doubt I'll need medication, so."

D'Angelo stated that he was currently seeing therapist Anthony Kelley, and had had seven sessions with him. D'Angelo found counseling "very, very helpful." He does not believe that he has a mental illness, but said he speaks his mind too much which gets him into trouble. D'Angelo said that Kelley is helping him with the anger he has towards "this courtroom" and "you individuals," and helping him "talk to you guys better."

D'Angelo testified that he is arrogant and confident, and has an attitude because he does not feel like anybody is working with him and feels like there is more help that he could be getting; he does not feel like things are fair for him. When asked what steps he had taken to put himself in a position to have the girls placed with him, D'Angelo said "I've been working -- trying to work with you guys. I've been staying out of trouble, you know." He has been employed full-time at AmeriLawn since July 2015. D'Angelo completed the pretreatment assessment, a psychological evaluation, and two psychiatric evaluations; he also completed parenting and anger management classes (but could not recall what he learned). D'Angelo was not ready to have the girls placed with him because "you guys are not working with me[,] we haven't been working together," but "if we do proceed, we will make a plan." D'Angelo wants Post "dismissed off this case." He thinks that if they came up with a good plan, he should get the girls back in 4 to 6 months.

D'Angelo testified regarding his criminal history. He was convicted in Federal Court in 2010 of conspiracy to distribute crack cocaine, and sentenced to prison for 15 years 8 months. He was released from custody in June 2012 and put on supervised release. An application to revoke his supervised release was filed in April 2013 and he was ordered back to prison; he was released in January 2014 and put on supervised release for 4 years (he was still on supervised release at the time of the January 2016 termination hearing). He has been subjected to random drug tests throughout his supervised release, and to his knowledge has never tested positive. In February 2015, D'Angelo was arrested and jailed for less than 34 hours regarding a domestic assault. Additionally in 2015, D'Angelo was jailed for less than 12 hours on a child support bench warrant;

he also spent a weekend in jail for "another false accusation, mistaken identity, stealing" a vehicle he was using, but no charges were filed. From 2014 to 2016 he has not been convicted for domestic assault or drug possession; his only convictions during that time frame were for driving under suspension and no proof of financial responsibility, both of which resulted in a fine. D'Angelo said he was a drug dealer in the past, but has paid his debt to society.

Anthony Kelley is a licensed independent mental health practitioner, a licensed professional counselor, and a provisionally licensed drug and alcohol counselor. He testified that he has been counseling D'Angelo on a weekly basis since December 12, 2015; they have had seven sessions. Kelley understands why D'Angelo was given his previous diagnoses (because he fit the criteria), and Kelley cannot rule out bipolar disorder. But Kelley thought "adjustment disorder" was a better fit than bipolar disorder because when you put "a little cultural background" with D'Angelo's thoughts, comments, and ideas (e.g. belief of being persecuted by others, aspirations of being a rap mogul), they are not so farfetched. He agreed that with the diagnoses given by other providers, the best treatment would be a combination of psychotherapy and medication management; in a letter from Kelley to Post dated January 5, 2016, received into evidence as exhibit 86, Kelley stated that he was in the process of discussing with D'Angelo the pros and cons of taking medication, "which [D'Angelo] is against."

Kelley was working with D'Angelo on making better decisions and on working well with others. Kelley believes that D'Angelo loves his daughters and wants to be with them. D'Angelo's mental disorder is not such that he is incapable of parenting, but whether he can adequately parent the girls right now is yet to be determined; he still has work to do, but he has the capacity to reach his goals. Kelley did not believe it was unsafe for the girls to have contact or communication with D'Angelo; however, on cross-examination, he said his opinion would change if D'Angelo was using or selling drugs, if there were domestic violence issues, or if D'Angelo did not believe that Claire currently posed a threat to the children (because given what he knows about Claire and the relinquishment of her parental rights, she should not be around the children until she participates in some sort of counseling).

In an order filed on February 3, 2016, the juvenile court found that the State had not proven by clear and convincing evidence that D'Angelo had abandoned his children under § 43-292(1). However, the juvenile court terminated D'Angelo's parental rights to Angeleah and Ava pursuant to § 43-292(2), (6), and (7), and found that termination was in the children's best interests. D'Angelo has timely appealed the juvenile court's order.

## ASSIGNMENTS OF ERROR

D'Angelo assigns, restated, that the juvenile court erred in: (1) finding grounds exist to terminate his parental rights under § 43-292(2) and (6); and (2) finding it was in the children's best interests to terminate his parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

ANALYSIS

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating D'Angelo's parental rights to Angeleah and Ava, the juvenile court found that D'Angelo substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection (§ 43-292(2)); having determined that the children were juveniles as described in § 43-247(3)(a), reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the determination (§ 43-292(6)); and the children had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Angeleah and Ava have been in an out-of-home placement continuously since April 2013. At the time the motion to terminate D'Angelo's parental rights was filed on October 8, 2015, the children had been in an out-of-home placement for approximately 30 months. By the time the termination hearing began in January 2016, Angeleah and Ava had been in an out-of-home placement for 33 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of D'Angelo's parental rights under § 43-292(7) were proven by sufficient evidence. See *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005) (section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent).

We need not consider whether termination of D'Angelo's parental rights was proper pursuant to § 43-292(2) or (6) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S.*, *supra*. Thus, the next inquiry is whether termination is in the children's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child(ren). *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a

- 11 -

reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interest analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

On July 15, 2014, this court reversed the juvenile court's initial termination of D'Angelo's parental rights. See *In re Interest of Angeleah M. & Ava M.*, No. A-13-1060, 2014 WL 3489846 (Neb. App. July 15, 2014) (selected for posting to court Web site) (juvenile court's judgment on mandate filed September 2, 2014). That decision provided D'Angelo a new opportunity to work with DHHS to correct the problems that led to the State's prior attempt to terminate his parental rights. Despite this new opportunity, when the matter came before the juvenile court for a dispositional hearing on September 9 and 11, 2014, D'Angelo told the court he did not agree with the recommendation of therapeutic visitation with the girls and that he refused such visitation. See *In re Interest of Angeleah M. & Ava M.* (case No. A-14-860, April 27, 2015) (not designated for permanent publication) (petition for further review denied June 17, 2015; juvenile court's judgment on mandate filed July 14, 2015). (We note that while D'Angelo said he did not agree with therapeutic visitation, he did ultimately participate in such visitation during the pendency of the appeal of the disposition order.) D'Angelo further testified that he did not need to contact DHHS when he had been released from incarceration and that he only needed to contact his attorney. *Id.* He acknowledged that he had not attempted to send the girls cards, gifts or letters since he had been released approximately 8 months before, and further stated that he did not need a substance abuse evaluation because he was on probation and claimed to have not used an illegal substance or alcohol in several years. *Id.* D'Angelo testified he was not willing to participate in a substance abuse evaluation, a pretreatment assessment, or a parenting assessment; he did not feel as though he needed the things that were being asked of him. *Id.* D'Angelo's testimony at that hearing was not indicative of a father looking out for his children's best interests by demonstrating cooperation and taking all steps necessary to be reunified. Rather, despite this second opportunity to work with DHHS, D'Angelo's reaction was to reject all recommendations that were designed to help him be reunified with his daughters.

The juvenile court entered a dispositional order on September 11, 2014, as discussed previously. The directives set forth in that order were not unreasonable, yet D'Angelo elected to appeal the order rather than comply with the requirements designed to help him be an appropriate and responsible parent to his children. In that appeal, D'Angelo assigned as error every directive given by the juvenile court in its September 11 order, including the simple requirement that D'Angelo inform DHHS of any change in address or telephone number. And now D'Angelo argues in the present appeal that he "has been given no meaningful opportunity to reunify himself with Angeleah and Ava," and that, "[i]n fact, he has been prevented from doing so." Brief for appellant at 47. We disagree.

D'Angelo made half-hearted efforts to preserve his parental rights, refusing to do anything that was not required of him, and yet failing to do all that was required. And while he had a right to appeal the September 11, 2014, dispositional order, there were certainly directives within that order that would have been easy to comply with and would have demonstrated a good faith effort to continue working towards reunification with his children. Instead, he argues,

If D'Angelo had completed a pretreatment assessment and/or a parenting assessment prior to the resolution of the appeal of the dispositional order, and the appellate court had determined that the juvenile court erred in requiring those two things, then for what purpose would he have done them? These are not exactly the sorts of tasks that people voluntarily undertake.

Brief for appellant at 47. That may be true in certain circumstances. But given the historical facts of this case, another perspective may have been that cooperating with such assessments should be perceived as an opportunity to show parental interest and ability; to demonstrate a serious dedication to doing what it takes to be a responsible parent out of consideration for the best interests of the children. The fact that D'Angelo appealed the simple directive to keep DHHS informed of any changes to his address and telephone number indicates an unreasonable attitude towards any effort being made to reunite him with his children. That same unreasonable attitude is evident in D'Angelo's other actions, notwithstanding opportunities missed during the multiple appeal periods, as discussed next.

D'Angelo's unreasonable attitude and unwillingness to be helped was evident in his failure to keep in contact with Post, the DHHS caseworker, who was working hard in order to "unify" (D'Angelo's preferred word) him with his daughters. He allowed only two face-to-face meetings with Post (October 2014 and October 2015), and only under his terms and conditions; he denied all requests by Post to have him present at team meetings. Emails from D'Angelo's counsel (the contents of which were received into evidence via Post's N-FOCUS documentation in exhibits 70 and 71) repeatedly state that D'Angelo was not required or court-ordered to meet with Post. We note, however, that the September 2014 disposition order does require him to cooperate with all service providers; regardless, it was clearly not in the girls' best interests for D'Angelo to refuse to meet with Post, who was trying to assist him with "unification." As stated by the juvenile court:

Upon receipt of the Nebraska Court of Appeals opinion reversing [D'Angelo's] termination of parental rights, [DHHS] caseworker, Heather Post, initiated attempts to contact D'Angelo E[.] From that point until the time of trial on the subsequent Motion for Termination of Parental Rights of D'Angelo E[.], Heather Post engaged in extensive ongoing efforts to communicate with and engage D'Angelo E[.] in the reunification and rehabilitative efforts. The vast majority of these efforts were met with resistance and, and, at times, disrespect. D'Angelo E[.] himself, or through counsel, questioned the need to maintain contact with the caseworker, the need to meet with the caseworker, and the need for assessments, and displayed an unwillingness to engage in team meetings and a mocking of professionals assigned to the case.

The evidence further establishes that, despite orders to notify DHHS of any change of address or telephone phone number, D'Angelo failed--or rather refused--to do so, further handicapping Post's ability to help him.

Eventually, D'Angelo did participate in parenting assessments (with Dr. Herdman after being dismissed from Dr. Rathburn's office for missing his appointments), pretreatment assessments, and psychiatric evaluations. Both Dr. Herdman and Manzel diagnosed D'Angelo

with bipolar disorder (manic, severe), as well as other disorders. Dr. Herdman testified that the bipolar issue really needs to be paid attention to and D'Angelo's mood instability is such that without appropriate psychiatric evaluation and possible medication it would be "very improbable that he could provide parenting safety for children." Manzel and Wheeler both recommended medication management to regulate D'Angelo's mood, but D'Angelo was not interested, despite Dr. Herdman's opinion in the November 17, 2015, letter to Post (found in exhibit 64), that "not taking medication will have a negative impact on [D'Angelo's] mental health and will be a detriment to his being able to parent his two daughters." Both Dr. Herdman and Manzel testified that psychotherapy alone was insufficient. Although Kelley's diagnosis of D'Angelo differed from that of other providers, Kelley agreed that with the diagnoses given by other providers, the best treatment would be a combination of psychotherapy and medication management. These professionals all attempted to assist D'Angelo so that he could safely parent his children. Again, D'Angelo refused to be helped. It was not until the termination hearing that D'Angelo expressed a willingness to try medication. D'Angelo's unwillingness to cooperate with treatment providers and follow their recommendations clearly goes against the children's best interests.

In addition to being uncooperative with DHHS and resisting help from mental health professionals, D'Angelo was often dishonest when discussing his contact with Claire. According to Post, throughout the dispositional phase, D'Angelo denied having ongoing contact with Claire. However, Post, Brooklyn, and the foster mother had all seen them together. D'Angelo acknowledged that he did still have contact with Claire, but that they were not romantically involved and did not live together. Again, there was contrary evidence. Brooklyn said D'Angelo and Claire were living together and that he was "with her"; and that D'Angelo was trying to get the girls back for Claire. Brooklyn also observed arguments between D'Angelo and Claire and that D'Angelo tells Claire that she is a "'worthless mom'" and that "'everything's her fault.'"

Although Kelley did not believe it was unsafe for the girls to have contact or communication with D'Angelo, on cross-examination, he said his opinion would change if there were domestic violence issues, or if D'Angelo did not believe that Claire currently posed a threat to the children. D'Angelo testified that he did not believe it is unsafe for the girls to be around Claire. D'Angelo is correct that there is no court order preventing him from having contact with Claire, however, his attitude on this issue shows he places his own interests before the best interests of his daughters. As noted by Dr. Logsden, any ongoing contact between D'Angelo and Claire would cause concern for the girls' security and safety because of the reasons that led to the children's removal from Claire's care and to the relinquishing of her parental rights. Even Kelley had concerns, testifying that it was unsafe for the girls to be around Claire. D'Angelo's ongoing contact with Claire was contrary to the girls' best interests.

D'Angelo did participate in therapeutic visits with Angeleah and Ava. However, the foster mother testified that throughout the time visitation was occurring, Ava had aggressive outbursts, was angry, and had bed wetting issues. She said that Angeleah held her fears in and reverted to sucking her thumb. Both girls lost focus on school work and had night terrors. Those behaviors resolved shortly after visits were suspended in February 2015. The foster mother testified that the girls' only subsequent contact with D'Angelo was at the parenting assessment in August, after which both girls were upset and emotional.

Dr. Herdman performed the parenting assessment in August 2015 and noted that the attachment between D'Angelo and his children is "almost non-existent." Even though D'Angelo had not seen his girls for 6 months at the time of the assessment, Dr. Herdman testified that if there is a positive bond between a parent and a child, the child is excited to see the parent even if they had not seen them in a while; Dr. Herdman did not see a positive bond in this case. We also find it significant that since his visits were suspended in February 2015, D'Angelo never once contacted Post to ask about the girls or inquire about their well-being.

Both girls have been diagnosed with PTSD and Ava has also been diagnosed with reactive attachment disorder. Dr. Logsden testified that the girls need consistency, predictability, and support within their environment in order to develop healthy attachments. She further testified that it is not in their best interests to continue in foster care. We agree.

Despite being given a second chance after this court reversed the original termination of parental rights order, D'Angelo failed to take advantage of that opportunity. Angeleah and Ava were first put into foster care in February 2011, briefly returned to their mother's care from November 2012 to April 2013, and then returned to foster care where they have remained. D'Angelo testified that he was not ready to have the girls placed with him because "you guys are not working with me[,] we haven't been working together." The evidence does not support this claim. As we have discussed, it was D'Angelo who was not willing to work with those trying to help him.

"Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We find that the State has rebutted the presumption of parental fitness. We further find that it is in the best interests of Angeleah and Ava that D'Angelo's parental rights be terminated.

CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating D'Angelo's parental rights to Angeleah and Ava.

AFFIRMED.